IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CASE NO.: 7:23-CR-28 (WLS-TQL) |
| | : | |
| DAVID J. CORBETT, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**ORDER**

Before the Court is Defendant David J. Corbett's ("Defendant") Motion to Suppress (Doc. 20) ("Motion to Suppress") filed on July 13, 2023. For the reasons stated herein, the Motion to Suppress is **DENIED**.

I. **PROCEDURAL BACKGROUND**

On March 14, 2023, Defendant was charged in a two-count Indictment (Doc. 1) with two counts of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. §§ 924(g)(1) & 924(a)(2). Defendant was arraigned on April 6, 2023, before United States Magistrate Judge Thomas Q. Langstaff and was released on bond. (Docs. 7 & 9). At his arraignment, Defendant entered a plea of not guilty. (Doc. 16)

Defendant filed his Motion to Suppress (Doc. 20) on July 13, 2023 and the Government filed its Response (Doc. 21) on July 25, 2023. The Court held a hearing on the Motion to Suppress on September 25, 2023. (Doc. 22). Following the hearing, the Parties were given additional time to prepare post-hearing briefs subject to the hearing transcript's availability on the record. (Doc. 25).

Defendant filed his post-hearing brief (Doc. 27) on October 15, 2023, and the Government filed its Response (Doc. 28) on November 6, 2023. Defendant filed a Reply (Doc. 29) to the Government's Response on November 9, 2023. All parties' respective briefs have been filed and the Motion to Suppress is, therefore, ripe for ruling.

1

**II.    FACTUAL BACKGROUND**

On or about January 4th, 2020, Lieutenant Rob Picciotti ("Lt. Picciotti") received a tip that Defendant had been involved in drug sales and use, and that he was in possession of a rifle in a truck he was operating. (Doc. 26 at 69). As a result, on January 8, 2023, Lt. Picciotti was conducting surveillance of Defendant's residence. (*Id.* at 70).

Defendant's residence, a house, is located on a five-acre parcel of land off Dykes Pond Road in Lowndes County, Georgia. (Doc. 26 at 32). The house is set back from Dykes Pond Road and is connected to the road by a driveway which runs adjacent to the house and into a carport at the rear of the house. (*See* Def.'s Exhibit 1). There is door to the house in the carport, which faces away from Dykes Pond Road. (Doc. 26 at 15). The house also has a front door, but it is not connected directly to the driveway. (*Id.* at 15). There is a shed connected to the driveway about 100 yards behind the house. (*Id.* at 32).

Lt. Picciotti was surveilling Defendant's property from an adjacent field to the side of Defendant's house, with a view of the rear of the home, including the carport and the shed. (Doc. 26 at 71–72). Defendant arrived home at approximately 5 P.M. in a pickup truck. (*Id.* at 72–73). Lt. Picciotti observed Defendant drinking a beer when he pulled onto his property. (*Id.* at 73). Defendant initially parked in the carport, disembarked, and went into his house. (*Id.* at 73–74). A short time later, he left the house, entered his truck, and drove the truck to his shed, where he began to work (*Id.* at 73–74). During this time, Lt. Picciotti observed Defendant drinking beer and smoking a vape pen. (*Id.*) After spending a short time at his shed, Defendant reentered his car and drove it back to his carport, disembarking and entering his home through the carport door. (*Id.* at 74).

About an hour later, Lt. Picciotti requested that Staff Sergeant Busby ("SSG Busby") and Investigator Jeremy Williams ("Investigator Williams") conduct a "knock and talk" at Defendant's residence to investigate narcotics and firearm possession. (Doc. 26 at 75). SSG Busby and Investigator Williams entered Defendant's property from Dykes Pond Road using the driveway and parked next to Defendant's house near the carport. (Doc. 26 at 14–15). SSG Busby and Investigator Williams approached the rear door to the house in the carport where Defendant had been seen entering his house last. (Doc. 26 at 48). Defendant's truck was parked a few feet away from the rear door. (Doc. 26 at 50–51). SSG Busby

2

knocked on Defendant's rear door and asked Defendant through the door if he could talk, making clear that Defendant was not under arrest. (Doc. 26 at 16). Defendant initially told SSG Busby he did not want to talk, but when SSG Busby began to walk away, Defendant opened the door and began to speak with SSG Busby. (*Id.*)

While SSG Busby was speaking with Defendant at the door, Investigator Williams walked up behind SSG Busby so that both officers were between Defendant's door and his truck. (Gov't Ex. 1b at 1:30 *et seq.*) Investigator Williams looked behind him to "mak[e] sure nobody is hiding," and looked into Defendant's truck and, through the window, saw an alcoholic beverage in the cupholder and a round of rifle ammunition in the center console. (Doc. 26 at 52–53). After seeing the alcoholic container and rifle round, Investigator Williams informed Defendant that he had seen an open alcoholic container sitting in his vehicle. (*Id.* at 55).

At this time, SSG Busby and Investigator Williams began a Driving Under the Influence ("DUI") investigation based on Defendant's behavior and facts observed by the officers. (Doc. 26 at 55–56, 73–74). As a result, Investigator Williams called for another deputy, who was not on the scene, Investigator Stokes, to conduct a field sobriety test. (*Id.* at 56, 78).

SSG Busby then informed Defendant that he was investigating him for DUI, at which point, Defendant attempted to step back inside of his house. (Doc. 26 at 56–57). SSG Busby then placed his foot in the doorway so Defendant could not close his door, and informed Defendant that he could no longer go inside. (*Id.*) Defendant was instructed to sit on the step leading up to his doorway and he complied. (*Id.* at 20). While Defendant was sitting, SSG Busby asked Defendant for consent to search his truck. (*Id.* at 20). Defendant, initially, told SSG Busby "I'd rather you not." (Gov't Ex. 1b at 5:00 *et seq.*) In response, SSG Busby told Defendant that it was his right to refuse consent under the Fourth Amendment but, if Defendant refused, he would apply for a search warrant, and that Defendant would have to stay outside of his house with officers until that search warrant is "either signed or not granted." (Gov't Ex. 1b at 7:30 *et seq.*) Defendant then gave SSG Busby permission to search his truck. (*Id.* at 8:15 *et seq.*) Inside, Officers recovered the open can of beer and the rifle round observed by Investigator Williams. (Doc. 26 at 78).

3

Once Defendant had given consent to search his truck, Lt. Picciotti was called to Defendant's property. (Doc. 26 at 77–78). When Lt. Picciotti arrived, Officer Stokes was conducting a field sobriety test on Defendant inside the carport. (*Id.* at 78). At that time, Lt. Picciotti advised Defendant of his Miranda rights and Defendant agreed to speak to officers. (*Id.* at 79–80). When Lt. Picciotti interviewed Defendant he admitted to possessing the rifle round inside his truck and admitted that there were two rifles and a pistol in his house. (Gov't Ex. 1c at 11:50 *et seq.*) Lt. Picciotti asked Defendant for consent to search his residence for the guns and informed him that, if he did not consent, Lt. Picciotti would apply for a search warrant. (Gov't Ex. 1c at 10:15 *et seq.*) Defendant then explained where each of the firearms were in his house and agreed to allow Lt. Picciotti inside the house to recover the firearms. (*Id.* at 13:15 *et seq.*, 14:50 *et seq.*) Defendant then led Lt. Picciotti to the threshold of his house. (*Id.* at 23:20 *et seq.*) At the threshold, Lt. Picciotti asked Defendant, again, whether Defendant consented to the search, and Defendant beckoned Lt. Picciotti through the threshold and into his house. (*Id.* at 23:35 *et seq.*) Defendant then lead Lt. Picciotti into the house, wherein, investigators recovered a Savage .308 rifle and a Taurus .38 special revolver. (Doc. 26 at 86). Defendant did not withdraw his consent during any time during the officer's search of his residence. (Doc. 26 at 87). The next day, Defendant turned over another hunting rifle to law enforcement. (*Id.*)

### III. LAW AND ANALYSIS

Defendant moves to suppress the firearms recovered from his home and the hunting rifle Defendant turned over to Lt. Picciotti on January 9, 2023. (Doc. 27 at 8). The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Defendant, as the movant, "bears the burdens of proof and persuasion" that his Fourth Amendment rights have been violated. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (citing *United States v. Eyster*, 948 F.2d 1196, 1209 (11th Cir. 1991)).

Defendant's motion raises four discrete issues: (1) whether investigators exceeded the scope of their "knock and talk," (2) whether investigators unlawfully seized Defendant, (3) whether Defendant's consent to search his vehicle and his house was coerced, and (4)

4

whether the exclusionary rule should apply to the hunting rifle turned over to law enforcement on January 9, 2023. The Court will address each in turn.

### A. Knock and Talk

Defendant contends investigators violated his Fourth Amendment rights when they exceeded the scope of the "knock and talk" exception to searches of property by "going to the rear entrance of the house and then looking into the vehicle in the carport at the rear of his house" (Doc. 27 at 8). The areas immediately surrounding and associated with the home, or curtilage, are protected by the Fourth Amendment. *United States v. Bruce*, 977 F.3d 1112, 1121 (11th Cir. 2020) (citing *Collins v. Virginia*, 138 S. Ct. 1663, 1676 (2018) (Thomas, J., concurring)); *Florida v. Jardines*, 569 U.S. 1, 7 (2013). Entry into the curtilage of the home to knock upon a citizen's door for legitimate police purposes—referred to as a "knock and talk" — however, does not implicate the Fourth Amendment. *United States v. Taylor* 458 F.3d 1201, 1204 (11th Cir. 2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 446 (1971)).

The knock and talk exception has two limitations: (1) it is geographically limited to the front door or a "minor departure" from it. *United States v. Walker*, 799 F.3d 1361, 1363 (citing *Taylor*, 458 F.3d at 1204–05).[1] And (2) it no longer applies if an officer's behavior "objectively reveals a purpose to conduct a search." *Walker*, 799 F.3d at 1363 (citing *Jardines*, 569 U.S. at 8–10). The Court finds that officers did not exceed the scope of the knock and talk exception for two reasons.

---

[1] Neither the Eleventh Circuit nor the Supreme Court have squarely answered the question of the precise definition of a "front door," for purposes of the knock and talk exception and whether that definition is rigidly confined to only the closest door to the road or refers to the primary entrance to the residence. *See Carroll v. Carman*, 574 U.S. 13, 19 (2014) ("we do not decide today whether . . . a police officer may conduct a 'knock and talk' at any entrance that is open to visitors rather than only the front door"). The Court, however, sees no reason to restrict the definition of "front door" to only the closest door to the road. Lt. Picciotti's testimony, and Defendant's own use of the residence, make it clear that the officers reasonably believed that the rear carport door was the primary entrance to the home. And the Court is persuaded by other Circuits applying a more flexible definition. *See United States v. James*, 40 F.3d 850 (7th Cir. 1994) ("the Fourth Amendment is not implicated when police officers approach [a] door in the reasonable belief that it is a principal means of access to the dwelling") *vac. on other grounds in* 516 U.S. 1022 (1995); *United States v. Garcia*, 997 F.2d 1273, 1279–80 (9th Cir. 1993) ("if the front and back of a residence are readily accessible from a public place, like the driveway and parking area here, the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling").

5

First, investigators did not exceed the geographic limit of the knock and talk exception. Lt. Picciotti[2] had a significant history with Defendant, and he testified that the carport door was "the primary door to the home from my interaction over the years there." (Doc. 26 at 73). Officers, therefore, made contact with Defendant through the primary door of the residence, even if there was a door closer to the public road. Moreover, even to the extent that officers did stray away from the front door of the residence, a small departure from the front door when seeking to contact occupants is permissible. *Walker*, 799 F.3d at 1364 (citing *Taylor*, 458 F.3d at 1205) (holding that officers approaching an open-sided carport instead of going to Defendant's front door did not exceed the geographic limit of the knock and talk exception). Officers may take reasonable steps to make contact with an occupant by visiting areas of the property other than the front door. *United States v. Diaz*, 404 F. App'x 381, 383 (11th Cir. 2010) (finding that an officer may initiate contact elsewhere on the property other than the front door but they must have a reason to do so, such as seeing a vehicle elsewhere on the property."[3] SSG Busby, before he approached the property, saw Defendant enter his house by way of the back door. (*Id.* at 15). The Court, therefore, finds that officers did not exceed the geographic scope of the knock and talk exception.

Second, even though Investigator Williams looked behind him through the window of Defendant's truck to see the open container and rifle round, this behavior was not, objectively, for the purpose to conduct a search. Instead, Investigator Williams remained in the geographic area of the knock and talk and turned around to look behind him for officer safety purposes, as he testified and as evidenced by his remark recorded on the body camera footage "I'm just making sure nobody is behind me brother," when he turned around to look at Defendant's truck. (*Id.* at 53–54) (Gov't Ex. 1a at 2:55 *et seq.*) Investigator Willaims looked in the window of the truck using a flashlight to check if there was someone inside the

---

[2] The Court, as the finder of fact for this Motion to Suppress, sees no issues with the credibility of the investigator witnesses, and therefore, credits their testimony as true. *See United States v. Joseph*, 978 F.3d 1251, 1262 (11th Cir. 2020).

[3] Although unpublished opinions are not binding precedent in the Eleventh Circuit, 11th Cir. R. 36-2, I.O.P. 2, they may be cited as persuasive authority. *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007). In the case of *Diaz*, the Court is persuaded by its interpretation of *Taylor* as authorizing officers to take reasonable steps to initiate contact by visiting areas of the property other than the front door.

vehicle. (Doc. 26 at 64–65). When Investigator Williams saw inside the truck he observed the open container and rifle round in an easily visible place within Defendant's truck—the cup holder and center console. (Doc. 26 at 53). No evidence adduced at the hearing reveals any other indication that Investigator Williams looked in Defendant's truck for the purposes of conducting a search. The Court, accordingly, finds that Investigator William's behavior did not objectively reveal a purpose to conduct a search. *See Walker* 799 F.3d at 1363.

Thus, the Court finds that investigators did not exceed the scope of the knock and talk exception and, therefore, did not violate Defendant's Fourth Amendment rights when they observed the open container and rifle round[4] in Defendant's truck when they were speaking with Defendant at his door.

### B.   Seizure

Defendant contends that investigators violated his Fourth Amendment rights by improperly seizing him without reasonable suspicion, and for an unreasonable length of time, when officers refused to let him re-enter his house while they conducted their investigation. (Doc. 27 at 5–7). Under the Fourth Amendment, officers may detain a person if, based on the totality of the circumstances, that officer has "reasonable suspicion that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 31 (1968)). To determine whether officers had reasonable suspicion, a Court looks to the totality of the circumstances known to the detaining officers at the time of the detention. *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) (citing *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996)). The determination of reasonable suspicion must be based on "commonsense judgments and inferences about human behavior." *United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)). Detention begins when an officer

---

[4] Defendant appears to suggest in his brief that Investigator Williams testified falsely at the hearing that he saw the rifle round and that, in fact, all Investigator Williams observed was an open container. As the Court has noted, it sees no issues with the credibility of the officers, and, therefore, finds as a matter of fact that Investigator Williams saw both an open container, and a rifle round in Defendant's truck. However, as the Court will discuss below, the open container in Defendant's truck was sufficient to justify the seizure of Defendant, and, therefore, whether Investigator Williams observed a rifle round in Defendant's truck through the window has no impact on the outcome of the instant motion.

7

restricts a person's freedom of movement, *West v. Davis*, 767 F.3d 1064, 1071 (11th Cir. 2014), which in Defendant's case, occurred when SSG Busby prevented him from going back inside his house. (Doc. 26 at 56–57).

Here, the DUI investigation of Defendant was based on, at least, five factors known to officers at the time of Defendant's detention: (1) there was an open alcoholic container in Defendant's truck, (*Id.* at 55); (2) Defendant admitted that he had been driving around the property, (*Id.* at 55); (3) Lt. Picciotti had observed Defendant drinking during the time he was driving around the property, (*Id.* at 73–74); (4) Defendant, according to SSG Busby, smelled of alcohol, (*Id.* at 18); and (5) Defendant appeared, according to Investigator Williams, "to be unstable on his feet, his eyes were really glossy, indicative of some people I've seen in the past with – that have consumed alcohol" (*Id.* at 56). Under Georgia law, a person may be convicted for DUI, when they are "under the influence of alcohol to the extent that it is less safe for the person to drive." O.C.G.A. § 40-6-391(a)(1). Georgia law does not distinguish between driving on public roads versus private property. *Madden v. State*, 555 S.E.2d 832, 834 (Ga. Ct. App. 2001) (citing *Cook v. State*, 139 S.E.2d 383, 384–85 (Ga. 1964)). Accordingly, the Court finds that, based on the totality of the circumstances known to investigators at the time of Defendant's detention, investigators had reasonable suspicion that Defendant was violating the Georgia DUI statute, and, therefore, did not violate Defendant's Fourth Amendment rights by detaining him for the purposes of that DUI investigation.

Defendant attempts to evade these difficult facts by characterizing the investigation as only an open container investigation, rather than a DUI investigation. (*See* Doc. 27 at 6). The Court agrees with Defendant to the extent that the Georgia Open Container law prohibits possessing an open alcoholic beverage in a passenger vehicle only on "the roadway or shoulder of any public highway." O.C.G.A. § 40-6-253. The evidence is clear, however, that Defendant was being investigated for DUI, as evidenced by the facts that (1) investigators told Defendant he was being investigated for DUI almost immediately after noticing the open container in his truck, (Gov't Ex. 1b at 0:45 *et seq.*), (2) investigators called for a field sobriety specialist to evaluate Defendant, (Doc. 27 at 56), and (3) the investigator's consistent testimony that Defendant was under investigation for DUI (*Id.* at 18, 19, 26, 36,

38, 56, 57, 66). Accordingly, the Court finds Defendant's argument that he was being investigated only for an open container violation when he was seized, unpersuasive.

Moreover, even were a DUI investigation unjustified, Investigators also had reasonable suspicion that Defendant was a felon in possession of a firearm. Along with the open container, Investigator Williams observed a rifle round in Defendant's truck and all investigators were aware that Defendant was a felon. (Doc. 26 at 20, 52).[5] And Lt. Picciotti had received a tip that Defendant had guns in his possession. (*Id.* at 79). Accordingly, the Court finds that the investigators had independent reasonable suspicion that Defendant was a felon in possession of a firearm.

Defendant also argues that investigators impermissibly extended their seizure. (Doc. 27 at 7). A seizure must not only be reasonable at the time of the seizure but must also "be limited to the time necessary to effectuate the purpose of the stop." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999)). The testimony of the investigators, and the body camera footage, however, reveal that the duration of Defendant's seizure was dictated by the time it took Investigator Stokes, an officer trained in conducting field sobriety tests, to arrive and conduct a field sobriety test. (Doc. 27 at 56, 103); (*See* Gov't Ex. 1a 0:45-15:00); and then by the time it took for Lt. Picciotti to obtain consent to search Defendant's house and complete that search (*See* Gov't Ex. 1c). The Court, therefore, has no reason to believe that investigators extended Defendant's seizure any longer than necessary to investigate the crimes of which, as noted, they had reasonable suspicion that Defendant committed.

Thus, the Court finds that investigators had reasonable suspicion to seize Defendant, and did not impermissibly extend that seizure, and therefore, did not violate Defendant's Fourth Amendment rights by seizing him.

### C. Consent

Defendant contends that investigators violated his Fourth Amendment rights by searching his truck and house without either consent or a search warrant. (Doc. 27 at 3–8). A warrantless search, even in the absence of reasonable suspicion or probable cause, may be

---

[5] As discussed above, the Court is unpersuaded by Defendant's suggestion that Investigator Williams testified falsely about seeing the rifle round. *See* note 4 *supra*.

constitutionally permissible if it is conducted pursuant to validly given consent. *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1306 (11th Cir. 2021) (citing *Schneckloth v. Bustamonte*, 412 U.S. 219, 222 (1973)). To be valid, however, consent must be voluntary, meaning that it must be "the product of an essentially free and unconstrained choice." *Gonzalez-Zea*, 995 F.3d at 1306 (citing *United States v. Benjamin*, 958 F.3d 1124, 1134 (11th Cir. 2020)) (internal quotations omitted). Whether a suspect voluntarily consented to a search is a question of fact which the Court must determine based on the totality of the circumstances, and the Government bears the burden of establishing the existence of consent, and that the consent was given freely and voluntarily." *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004) (citing *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)). To determine whether consent is voluntary the Court should consider the following, non-exhaustive, factors: (1) the presence of coercive investigative procedures, (2) the extent of Defendant's cooperation with investigators, (3) the Defendant's awareness of his right to refuse consent, (4) Defendant's education and intelligence, and (5) Defendant's belief that no incriminating evidence will be found. *Benjamin*, 958 F.3d at 1135 (citing *Purcell*, 236 F.3d at 1281).

    **i.**    **Consent to Search Truck**

Defendant argues that his consent to search his truck was not voluntary. (Doc. 27 at 5–6). The Court disagrees; the totality of the circumstances reveals that Defendant freely and voluntarily consented to the search of his vehicle. The Court finds so for three reasons. First, although Defendant had been seized for a DUI investigation, he was never in handcuffs, (s*ee* Gov't Ex. 1a at 0:30 *et seq.*); (Gov't Ex. 1b 0:00-8:40), and officers told him throughout the encounter that he was not under arrest. (Doc. 26 at 58, 60, 84). Second, SSG Busby, while sitting next to Defendant, thoroughly explained that he had a Fourth Amendment right to refuse the search. (Gov't Ex. 1b at 5:30 *et seq.*) ("you are guarded under the Fourth Amendment to deny that search of your vehicle"); (*id. at* 5:55 *et seq.*) ("you can tell me to fuck off"); (*id.* at 7:00 *et seq.*) ("do you consent to a search of your truck, yes or no") (*id.* at 7:40 *et seq.*) ("if you do not consent that's fine, you are guarded under the Fourth Amendment to say no"). Third, although SSG Busby informed Defendant that he would apply for a warrant based on the items Investigator Williams had seen in the truck, SSG Busby did not tell Defendant that he was guaranteed to be granted such a warrant, or that

10

Defendant would be arrested if he did not consent to the search. (Gov't Ex. 1b at 7:59 *et seq.*) (Doc. 26 at 24). And fourth, there were no other circumstances which lead the Court to conclude that investigators were using coercive investigative procedures to impinge upon Defendant's voluntary choice to allow investigators to search his truck. Accordingly, the Court finds that Defendant gave valid consent to search his truck, and therefore, the investigators did not violate his Fourth Amendment rights when they searched his truck without a warrant.[6]

### ii.   Consent to Search House

The Court finds Defendant's argument that the search of his house was involuntary, similarly unpersuasive. (*See* Doc. 27 at 4–6) The totality of the circumstances again reveal that Defendant freely and voluntarily consented to the search of his truck. This time, for seven reasons.

First, as with the consent to search his truck, Defendant was never in handcuffs, even after officers had discovered the bullet in Defendant's truck. (*See* Gov't Ex. 1c at 2:30-24:04). Second, Lt. Picciotti informed Defendant that he was not under arrest, even if he did not consent to the search. (*Id.* at 7:05 *et seq.*, 9:50 *et seq.*, 10:50 *et seq.*, 23:30 *et seq.*) Third, Lt. Picciotti allowed Defendant to negotiate who would come into the house, because Defendant did not feel comfortable with the other investigators coming into his house—suggesting that Defendant was able to exercise free will about the terms of the search. (Doc. 26 at 83–83). Fourth, Lt. Picciotti informed Defendant of his right to refuse the search, (Gov't Ex. 1c 10:50 *et seq.*) ("[refusing the search] is your choice"); (*id.* at 21:40 *et seq.*) ("if you *choose* to consent to the search here is what would happen") (emphasis reflects inflection); (*id.* at 23:25 *et seq.*) ("let me tell you this Jake, you don't have to consent to this search). Fifth, although Lt. Picciotti said that if Defendant did not consent he would apply for a warrant,

---

[6] Defendant points to the fact that SSG Busby put his foot in the door of Defendant's home when Defendant attempted to re-enter his house as evidence of coercion, relying on *Moore v. Pederson.*, 806 F.3d 1036 (2015) *cert. denied*. However, *Moore* is inapposite, as it pertains to entrance into a person's home to effectuate a warrantless arrest, not the voluntariness of consent to a warrantless search. *See Moore*, 806 F.3d at 1045. Accordingly, *Pederson* cannot save Defendant here, even to the extent that SSG Busby's minor entrance into Defendant's home could overcome the abundant factors which cut in favor of a finding that Defendant voluntarily consented to the search of his truck.

11

Lt. Picciotti was clear it was not guaranteed that a judge would grant him one. (*Id.* at 10:15 *et seq.*) ("you have a choice, I can consensually with you step inside and recover those firearms or I can apply for a search warrant today based upon on the evidence"); (*id.* at 24:50 *et seq.*) ("one of us goes and types a warrant, most likely me, and presents that to a superior court judge tonight to see if he finds I have probable cause"). Sixth, even after Defendant consented the first time, before Defendant entered the residence, Lt. Picciotti stopped him and asked him again if he consented, and in response, Defendant beckoned Lt. Picciotti in. (*Id.* at 23:30 *et seq.*) Seventh, Defendant cooperated with investigators throughout the search of his house, helping them locate the guns recovered. (*See Id.* at 23:30-49:03). Accordingly, the Court finds that Defendant gave valid consent to search his house, and therefore, the investigators did not violate his Fourth Amendment rights when they searched his house without a warrant.[7]

Thus, the Court finds that investigators obtained valid consent from Defendant to search his truck and house, and therefore, did not violate Defendant's Fourth Amendment rights by seizing him.

### E.   Exclusionary Rule

Defendant contends that the Court should suppress the rifle and ammunition turned over to police on January 9, 2023, because they were discovered only as a result of previous Fourth Amendment violations. (Doc. 27 at 8). The exclusionary rule renders inadmissible evidence which is later discovered and derivative of an illegal search or seizure, or evidence which is "fruit of the poisoned tree." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1112 (11th Cir. 1990) (citing *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Defendant's argument that the exclusionary rule applies here fails for two reasons. First, as noted, there was no illegal search or seizure, and therefore, even evidence derivative of evidence discovered by investigator's search of Defendant's truck and house, is not barred by the exclusionary rule. Second, even assuming for the sake of argument that investigators violated Defendant's constitutional rights, Defendant has pointed to no evidence, and the

---

[7] Defendant argues that because Defendant was unlawfully seized, any consent obtained after the seizure was invalid. The Court finds this argument unpersuasive because Defendant was not unlawfully seized, as discussed above.

12

Court can find none, that Defendant's decision to voluntarily surrender his firearms to Lt. Picciotti on January 9, 2023, was sufficiently related to Defendant's alleged unlawful search and seizure, to warrant application of the exclusionary rule. *See Terzado-Madruga*, 897 F.2d at 1113 (citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)) (the exclusionary rule does not apply to evidence discovered by means "sufficiently distinguishable to be purged of the primary taint"). Accordingly, the Court declines to apply the exclusionary rule and suppress the firearms turned over to Lt. Picciotti on January 9, 2023. In any case, upon the totality of the circumstances, the Court finds that Defendant voluntarily turned the rifle over to investigators.

## IV.   CONCLUSION

In sum, investigators did not violate Defendant's Fourth Amendment rights when they seized the firearms at Defendant's house, and the exclusionary rule does not bar the admission of the firearm turned over to Lt. Picciotti on January 9, 2023. Accordingly, the Court **DENIES** Defendant's Motion to Suppress (Doc. 20).

**SO ORDERED**, this 22nd day of November 2023.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**